CLINTON SERVICE COMPANY *v.* THORNTON, et al.

No. 40699 March 10, 1958 100 So. 2d 863

2

*Pyles & Tucker,* Jackson, for appellant.

4

*J. E. Skinner,* Jackson, for appellees.

ETHRIDGE, J.

The issue is whether, on general demurrer to the bill of complaint, an option to execute a lease on a filling station is unenforceable in a suit for specific performance, on the ground that provisions of the lease would be harsh and oppressive.

Appellant, Clinton Service Company, filed a bill in the Chancery Court of the First Judicial District of Hinds County against C. D. Thornton and Robert Dennis Thornton for specific performance of an option to lease a filling station owned by defendant-appellees, and for damages. A general demurrer to the bill was sustained, and the bill dismissed. So on this appeal we must accept as true the averment of facts in the bill and reasonable inferences from them.

## I.

Clinton Service Company is a corporation domiciled in the City of Clinton, and engaged in the business of wholesale selling and distribution of petroleum products. Defendant, C. D. Thornton, proposed to the president of Clinton Service that the latter assist him in financing the construction of a filling station on land owned by defendant on U. S. Highway 80 in the community of Van Winkle, south of Jackson. On June 7, 1949, complainant

and Thornton entered into the contract which is the subject of this litigation. It was for a term of ten years with an option for an additonal ten years. For "mutual valuable considerations" Thornton agreed to advertise and sell, for a period of ten years, only Shell petroleum products handled and distributed by Clinton Service. The latter was to sell Thornton at its regular prices all petroleum products to be sold by him at retail at his filling station.

Clinton Service agreed to furnish and install pumps, underground tanks, a rotary lift, and other equipment, but it would retain title in this property. Clinton Service agreed to make certain repairs and improvements to the filling station as a "material inducement to the parties to irrevocably bind and obligate themselves to each other as herein provided." Paragraph (3) of the contract then stated: "Should the buyer, during the life of this contract, decide to sell the above described site and property to another, or should he elect to discontinue the sale of such petroleum products thereat, then, in such event the seller is granted the irrevocable option within thirty days after written notice from the buyer to such effect to have the said buyer, or his grantee of said property, execute to the seller, or its nominee, a lease on said premises for a period of ten years with an option to extend the same on the same terms and conditions for a like period at a rental of $5.00 per month, payable monthly, in advance, during the life of such lease which shall otherwise be in the standard and usual and customary form in common use in such case in this state, plus 1¢ per gallon on all gasoline sold by the seller to the buyer."

Thornton agreed to pay the taxes on the property and to pay all obligations of the business. The contract was recorded in the chancery clerk's office. Complainant performed its obligations under the contract, installed the equipment and made the repairs. Thornton operated the filling station under this contract for more than seven

years prior to the filing of the suit in March 1957. In 1951, C. D. Thornton conveyed a half interest to defendant Robert Dennis Thornton, but no question is raised here as to the liability of both parties under this contract.

In August 1956, defendant told various persons that they planned to discontinue the sale of complainant's petroleum products. They erected on the property several buildings for business and professional uses as a small shopping center. They began construction of another filling station at a different location on Highway No. 80, with the purpose of discontinuing the sale of complainant's products. In August 1956 complainant wrote defendants advising them that they had heard of the proposed change, stating its desire to continue the contract, but, if defendants did not desire to operate the filling station, complainant intended to exercise its option for a lease on the property.

On September 10, 1956, defendants replied: "We thought we had made it clear that we were going to tear it (the station) down, when we asked you about six weeks ago to try to get another location. In about ninety days from this date we plan to move the location of your pumps in a southerly direction about eighty-five feet."

On September 13 complainant by letter gave the Thorntons notice that it desired to exercise its option for a lease under the contract and offered to prepare the necessary instrument. They then advised complainant that they would continue operation of the filling station; but, nevertheless, in December 1956, they began to move some of the equipment to another location, so on December 4 complainant requested that this equipment be placed back at the original station, protesting the violation of the contract, and again advising that it intended to exercise its option rights.

In January 1957 defendants closed the filling station and moved their operations to another location one block east across the highway. They ceased to purchase and sell petroleum products of complainant at this location.

The bill charged that defendants therefore elected to discontinue the sale of petroleum products at the filling station, and, under paragraph (3) of the contract, complainant was entitled to a lease of the premises; and that defendants should be required to execute such lease. It was alleged that complainant had no adequate remedy at law, and it had sustained damages and loss of income from its business as a result of such breach of contract in the amount of $900 per month, plus the loss of good will and other stated damages. The bill sought a temporary injunction restraining defendants from removal of equipment from the premises, a final decree requiring the defendants to specifically perform the contract by executing a lease to complainant under the terms of paragraph (3), and also damages.

The defendants filed a general demurrer, setting up five grounds: No equity on the face of the bill; the contract is without mutuality of obligation or remedy, and hence unenforceable; the contract is so harsh and oppressive as to warrant a court of equity in refusing specific performance; the contract is vague and ambiguous; and complainant has an adequate remedy at law. The chancery court sustained this demurrer, and dismissed the bill of complaint.

## II.

 Appellees contend that the contract is unenforceable because of want of mutuality of obligation and remedy. Although consideration is essential, mutuality of obligation is not, unless the want of mutuality would leave one party without a valid consideration for his promise. 12 Am. Jur., Contracts, Section 14. The doctrine of mutuality is inapplicable to unilateral contracts. If a promissor has received sufficient consideration, his promise is binding, even though the consideration is not a promise. Hence an option supported by a consideration is valid even though the holder is not obligated to exercise it. The essence of an option con-

tract is that it is not mutual. 12 Am. Jur., Contracts, Section 14. Fry's doctrine that a contract to be specifically enforced must be mutual is obscure and logically inconsistent. The requirement of mutuality of obligation may be a prerequisite of the formation of a valid bilateral contract, but there is neither mutuality of obligation or of remedy in a unilateral contract. ██ █ Where the promissee had paid a consideration for the option, he has furnished that element necessary to make it binding upon the promissor—optionor. 5 Willison on Contracts (Rev. ed. 1937), Sections 1433, 1434, 1440, 1441; 2 Rest. Contracts, Sections 376, 372.

According to the averments in the bill, Clinton Service installed the equipment at the filling station, made the repairs on the building, and furnished petroleum products at established prices to appellees. Appellees accepted these services and equipment, and operated the station under the contract for seven years. ██ █ Clinton Service thus furnished the consideration for the contract and option and converted the latter into an irrevocable offer. Clinton Service has now accepted the offer, and a new bilateral contract arose. This is the contract which complainant wants to have specifically enforced. ██ █ It is well settled that, where an option is given for a valid consideration, the acceptor may obtain its specific performance. 5 Williston on Contracts, Section 1441.

### III.

██ █ On the pleadings the contract does not appear to be so harsh and oppressive as to warrant the chancery court in refusing specific performance. The principle relied on by appellees is analyzed in 5 Williston on Contracts, Section 1425, p. 3990: ". . . it maybe said that whereever a contract though legally valid is grossly unfair, or its enforcement opposed to good policy for any reason, equity will refuse to enforce it, and though certain kinds of unfairness may be classified, equity de-

clines to make an exact inventory of what amounts to such unfairness or impropriety as will preclude relief, but leaves a border land where the court can consider the particular facts of each case and deal with it on its merits. In certain cases, though the circumstances may be insufficient to warrant rescission or cancellation, the court in its discretion may refuse specific performance. So, if the contract is unconscionable in its terms, equity will not enforce it." 2 A. L. I., Rest. Contracts, Section 367; 81 C. J. S., Specific Performance, Section 18.

■■ ■ However, where the hardship has been fairly and voluntarily assumed as a part of the contract sought to be enforced, specific performance may be granted. The mere fact that defendant made a bad trade or bargain is not sufficient to defeat an obligation for specific performance. 49 Am. Jur., Specific Performance, Sections 59-65.

■■ ■ Whether the contract here falls within the limitations of the unfairness and hardship rule should be developed in a trial on the merits. The pleadings before us do not indicate that the contract is of that type. The evidence may or may not show that the type of lease provided for in the option and the stated rental are usual and customary. It should indicate the revenues derived by appellees in operating the station over a period of seven years under the contract; the rental which may accrue to appellees under the proposed lease, the type of services and performance appellant has rendered under the contract, and the value of repairs made by appellant on the premises. All of these and other circumstances are relevant in ascertaining whether the contract is so harsh, unfair and oppressive as to warrant denial of specific performance. The allegations of the bill, and the contract itself, do not support a denial.

Annotations in 83 A. L. R. 1416 (1933) and 126 A. L. R. 1375 (1940) contain comprehensive discussions of the cases dealing with "rights and remedies of parties in re-

spect to lease of filling station." Standard Oil Company v. O'Hare, 126 Neb. 11, 252 N. W. 398 (1934), and Cities Service Oil Company v. Kuckuck, 221 Wis. 663, 267 N. W. 322 (1936), in which specific performance of filling station leases was denied, are not in point, because, among other reasons, the lessees had a right to cancel upon a brief notice.

The ambiguity in the last clause of paragraph (3) of the contract is probably more apparent than real —at least the bill of complaint so alleges. Complainant should have an opportunity of proving the intention of the parties with reference to it. Otherwise the proposed form of lease, under the averments in the bill and under the contract, is not ambiguous and indefinite. Nor has appellant a full, complete, and adequate remedy at law.

Reversed and remanded.

*McGehee, C. J.,* and *Lee, Holmes* and *Arrington, JJ.,* concur.